David Tropp, 2011-10-23 Mr. Dynan, is it Dynan? It is Dynan. Dynan, we're ready when you are. I'm ready. Good morning, Your Honor. This is Donald Dynan for David Tropp. Your Honor, this case concerns the theory of control and direction, the mastermind theory, in multi-participant claims. Particularly as how that would apply to an agency of the United States government. In this case, the Transportation Security Administration, the TSA. The case concerns what's known as TSA locks. The problem that had arisen after 9-11 is the TSA announced... I think we understand the technology. Would you mind if I have you look at claim one with me? I want to make sure I understand the four elements and who is alleged to do what. Okay? Yes. Do you mind if I walk through that with you? The first element would be making available to consumers a special lock. Now, I understand that there is some question arguing, some argument potentially, between whether TRAVEL SENTRY or its licensee was doing it, whether there's direction or control there. Am I right that the lower court never reached that issue because it ruled on the TSA basis? That is correct, Your Honor. Okay. Because I read this, making available to consumers a special lock, well, by licensing it from TRAVEL SENTRY to the licensee, how hasn't TRAVEL SENTRY done this, made it available? By licensing it. Yes. Our position in the district court was that, as concerns step one, that TRAVEL SENTRY itself fulfilled at least certain of those steps, such as this one, but that its licensees also fulfilled them. Okay. So, step one, making it available, TRAVEL SENTRY does that, even if they're not the ones selling it to the ultimate consumer, because they are licensing the person who is selling it to the consumer, and in that way, they're making it available. That would be correct. Okay. So, TRAVEL SENTRY, that one. And the next one, marketing the special lock to consumers. The argument there, as I understand it, is between TRAVEL SENTRY and the licensee, and the question is whether TRAVEL SENTRY directs or controls the marketing effort. Again, in this case, we argued in the alternative. TRAVEL SENTRY, on its website, markets the lock. You go to TRAVEL SENTRY's website, they tell you you should buy this lock, why you should buy it, where you can buy it, and I believe that's marketing. Okay. And also, your argument with regard to the licensees, as I understand it, is that there are all kinds of trademark agreements, and there's a lot of control, in fact, reviewing and editing of advertisements. That is correct. The linchpin of TRAVEL SENTRY's control is that they have the trademark on the identification structures, it's called in the claim, which is the red diamond. The whole system is predicated on that in this year of identification, on the identification structure, because if you don't know it's a TSA lock, you wouldn't know to do the rest of it, including to go to the keys and which key to use, and the consumer wouldn't even know to buy it, to know he was buying the TSA lock to protect his luggage. Because they have the trademark on it, nobody can use that without their permission. When you tie that in with the MOU, with the TSA, if you don't have permission, if you don't have the identification structure, the signal, if you will, the TSA wouldn't know what to do and wouldn't be able to do anything. So the trademark is the key of the nexus of how TRAVEL SENTRY is able to control the whole situation. Okay, so the last two factors are the ones that are allegedly performed by TSA. So explain your argument, if you could, about why you believe those are being directed or controlled by TRAVEL SENTRY. Yes, and this is all done through the MOU. TRAVEL SENTRY, through the MOU, provides the method, the means, through the identification structure and through the keys that they provide that would open. They provide the codes. That's really the fourth step, isn't it? The third step is like a whereas clause. It's not a step at all. The fourth clause involves the key to use the special procedure to open the piece of luggage, and that is performed by the TSA people. So why aren't we involved here with the, what is it, an 800 pound gorilla? We've got an in-bank case on joint infringement. So how can we decide this case in your favor? Because the issue here is not that TRAVEL SENTRY is controlling the TSA. Obviously, nobody would argue. But they're directing it, aren't they? In the sense that they provide the training materials. They train them. They provide the keys. They provide the codes. They tell them how to read the codes, to use what keys. You're walking right into our in-bank case, which means how can we decide this now? Really, in two ways. When you look at BMC and Muni Archam, it's clear that an arm's length doesn't provide. However, if you have vicarious liability, then it meets the test. How does it meet the test of vicarious liability? The TSA can decide whether to follow this procedure or not. That is the pressure, correct? Yes, and the district court relied on that. But although the TSA has discretion on whether it's going to use the system or not, there's still the contract. The MOU is still a contract because when they do use the system, they are following the MOU. As a practical matter, the TSA advertises on its website and other places that it's committed to using the system. So the issue is not whether they have to use it 100% of the time, but whether they would use it. The contract does give them the discretion. It does give them the discretion. In reality, at least they tell everybody they use it, most if not all the time. So the contract really doesn't add anything in terms of control when TSA has the discretion whether to use it or not. Because when they do use it, if you have a contract with someone, and in performing the contract, let's say you're infringing some patent, it doesn't take you out of infringement that you don't always follow the contract. We would argue that here. Why aren't you even mentioning the Best Efforts Clause? I would think you'd be mentioning it. Well, yes. To go back to that, the TSA clearly says that it commits to make good faith efforts to distribute the past keys and information provided by Travel Sentry on the use of the past keys and to use the past keys and information provided by Travel Sentry. And that's at page 509 of the Joint Appendix. So they do have that best efforts and they do advertise that they use it. On the issue, going back to the Enfant case, in Mooney Auction, you have on one hand direct infringement is not enough. On the other, Mooney Auction says the control and direction standard is satisfactory in situations where the law would traditionally hold the accused direct infringer vicariously liable. We would submit with respect that that language means that it holds that such facts would be sufficient, but it does not state that they are necessary. In other words, that there is a ground between the arm's length and between vicarious liability where this court can find control and direction. For the reason I just stated, I believe they would submit that there is control and direction when the TSA follows the MSU, which they tell everyone that they're using best efforts to do and advertise on the website that they do. But to go over to vicarious liability, remember this case was decided on summary judgment, that you have in the evidence where the TSA, specifically in the MOU, states that it does not have any liability. You have a travel century and the license agreement provides that all the lock manufacturers have to have product liability. And third, we have in the record, where the TSA routinely refers people who come in and complain my lock was broken, my luggage is smashed open, they refer them to TSA for their claims. And I think under traditional tort theory, if you make a lock or provide a lock or provide a system and somehow or another somebody suffers a harm, that that can go back to them under the theory of vicarious liability. We certainly should have had the opportunity to argue that to the jury, where a jury could have reasonably found that under those facts that there was vicarious liability. In concluding, last minute, on the cross-claim on the attorney's fees, we would submit that the district court's decision denying should be upheld. This is not an exceptional case under Section 285 of Title 35 and Section 1927 of Title 18. The claim was not objectively baseless. Indeed, what is the law of control and direction is still being considered by this court in the Umbach case and the Acme case. And there was clearly no showing of bad faith on the part of the patentee. I'd like to reserve the rest of my time. We will do that, Mr. Dine and Mr. Prickett. Good morning, Your Honors. May it please the Court. I think it's useful if I start with the district court's decision on non-infringement. And in that decision, the court correctly found that there was no basis, no basis, to find that Travel Sentry either directed or controlled the TSA to a degree that Travel Sentry could be vicarious liability. Yes, but given that we're reconsidering whether or not vicarious liability is or is not the correct standard, how do we possibly resolve this case until Acme and McKesson are resolved? Your Honor, first of all, as litigants, we take the law as we find it today. And we don't know what the court is going to do with respect to those two Umbach cases that are pending. I will say I'm an eternal optimist in that the fact that the court scheduled argument for this case today, I believe that there's at least a fighting chance that the law, if it is to be changed, will not be changed to a degree that would change the facts. You fail to appreciate how the government works. Nevertheless, Your Honor, we find ourselves today with the law as it is and as it was during the pendency of this case, and that's what my argument is about here today. So we push the gorilla aside for now? For now, yes, Your Honor. In fact, Your Honors, the record below was that there is in fact no evidence, not a single piece of evidence, that Travel Sentry has sufficient control over, as Your Honor pointed out, the 800-pound gorilla of the government. How about the direction, though? Wasn't that part of one of our earlier tests, direction? TSA is operating according to the patentee's instructions and contract. The direction and control, the word direction in that test, isn't equivalent to instructions, as the court has held repeatedly. It is direction. I direct you to do this because I have either an agreement or a contract that says you must do this, or if you don't, you're liable. Well, first off, that's the Akamai case, which is now vacated. So that's not the rule. The rule isn't it has to be direction pursuant to a contract. No case of ours has said that except for Akamai, which we vacated. Well, let me say, the direction has to be such direction that the director, if you will, would be vicariously liable for the actions of the actor who is performing the steps that allegedly infringed. Why should that be the test? Well, at the risk of re-arguing Akamai, Your Honor, I think that that is the test because if it isn't the test, this is a perfect example where concerted action, for example, or some other nebulous test like that would be entirely unfair because, again, we are talking about a strict liability statute here. This is not inducement or contributory infringement. This is direct infringement, and it would be entirely inappropriate for independent actors like Travel Sentry, like the consumer, like the TSA to be liable for infringement of these claims if, in fact, there isn't somebody in that process that is controlling, at least to a degree of vicarious liability. No, but controlling, again, as Your Honor pointed out, the test has always been direct or control. If the words were meant to be entirely redundant, I doubt that we would have repeated them quite so often that way. So direction is obviously something less than control. Why isn't it just given its plain meaning to direct someone to do something? Why do we have to attach a consequence for their failure to do it in order for it to be direction? I think there are two different things, and what I'm saying is, under the law, the direction has to be such that the person giving that direction must be vicariously liable for the acts of the person who is being directed. And here, there is absolutely not a scintilla of evidence that Travel Sentry has that type of direction over the TSA. The record is clear that the TSA performs its luggage screening in the way that it wants to do it, in the way that it chooses to do it. The only thing that Travel Sentry does is provide keys that are used by the TSA and instruction on how to use those keys, and I would submit, Your Honors, that that is exactly the situation that this Court found in Muni Auction. And in fact, the District Court correctly found that it is precisely the situation that this Court held in Muni Auction is not sufficient to find direct infringement. Well, here, as opposed to Muni Auction, there's also training, and there's also an MOU, which is effectively a contract under which TSA has to use its best efforts. If TSA sees using its best efforts, there could potentially be a cause of action against them. So why isn't that an element of direction that is sufficient to meet the standards? Your Honor, it simply is because there's no way in which Travel Sentry could be held vicariously liable for whatever the TSA does. And indeed, I would actually submit that I don't think there is a cause of action, or there would be a cause of action, based on the language of this MOU. The TSA has the discretion to follow or not follow the practice that it does follow. And therefore, there's nothing in that agreement that would give a hook for Travel Sentry to sue the government for breaching its best efforts. Well, it says best efforts. If the clause expressly says best efforts, and it turns out someone doesn't use their best efforts, you absolutely can sue them, can't you? I think if you have a factual basis to do so, I think it would be literally, if not impossible, very close to impossible in this case to sue the government for... It may determine a determination, and presumably it would make a determination based on national security, not to do something or to do something differently than it might have done in the past. I think it would be almost impossible for Travel Sentry to prevail on the claim. Based on the fact that the TSA was expressly given discretion as to the extent to which they would be obligated to perform any security operations. Precisely. Now, Mr. Trott argues that... Mr. Trott, I think, confuses the point about the discretion and the non-combining nature of the MOU. He says that that means that when the TSA decides not to pursue any kind of screening activity, it's permitted to do so, but the fact that it does in reality do so means that it engages in actions which allegedly are covered by the passage. That's not the point. The point is that because the MOU doesn't require the government to perform these steps, there is no possibility for Travel Sentry to be vicariously liable for the government's steps. I think that covers the issue of non-infringement, and for the reasons that the district court stated below, there is no basis in this record to find that Travel Sentry sufficiently directs and controls the TSA for there to be direct infringement by Travel Sentry. Now, what makes this case somewhat unusual, and I would submit that very unusual, is that in this case, Trott knew from the very beginning, indeed several years before this case was filed, that Travel Sentry did not have that necessary direction or control. And the reason he knew that is because he has virtually the same MOU with the government as Travel Sentry. And therefore, this is not the type of case where a patentee would need to engage in discovery to figure out what exactly is the relationship between Travel Sentry... Have you not discerned from my questions that I'm a little skeptical about your arguments with regard to vicarious liability? Because you're now moving into your attorney's fees argument. I am indeed, Your Honor. Yes, I know. And given my skepticism, which I haven't really masked, don't you think that it's kind of tough? You have an uphill road to prove an entitlement to attorney's fees, that there is no reasonable basis. Given the state of our law being in a huge state of flux with Akamai in bank right now, how can you say they don't have a reasonable basis to file and or pursue their claims? Who knows what's going to come out of Akamai? Your Honor, because that would be... A rule will come out that entitles another summary judgment. That is always possible, Your Honor. But that would be an argument by hindsight. When you look at the case law on exceptional cases, and in particular, whether a case is frivolous or not, and that's what we're talking about here, nothing else, whether this case is frivolous, you look at the law at the time the case is brought and during the time... And this case was filed prior to BMC and the inauction. That's correct, Your Honor. On what basis are you going to say they had no valid way to bring this claim? I mean, it was even pre-BMC and the inauction, which you relied on extensively in your brief as the reason for you to prevail on this vicarious liability thing. So there's no holding or precedent on the book about this. All the ones you rely on for prevailing did not exist at the time they filed that claim. So why was it so frivolous for them to have filed it that you should get attorney's fees? Your Honor, let me address your second point first, which is there in fact is in our brief precedent that this court cited in BMC itself that predated BMC and that predated the commencement of this lawsuit where the court held that in order for direct infringement of a method patent, all of the steps must be performed. And if they're not performed by a single entity, it's inappropriate to combine the steps of independent actors. And that's the Fromson and Cross medical cases. But even if the law was not crystal clear at the time this case was filed, that was January 2007, eight months later BMC came out. And at that point in time, the vicarious liability standard was set. Wow. And it's the third sentence of the decision, Your Honor. That was the test at that point in time. And Mr. Trapp continued to litigate this case for three more years. And the law didn't change from that point. It got more precise, but it didn't change from that point forward. I would also point, Your Honors, to the briefing in a related action brought by Mr. Trapp against Travel Century's licensees in which he asserted the exact same patents under the exact same theory, namely that Travel Century controlled the TSA. And even in that case, Mr. Trapp referred to the MOU in this case, which was literally the only thing he could try to cite to support his case, as nothing more than an aspirational expression of joint hope that TSA would make good faith efforts to use Travel Century locks whenever practicable, no mandate, no specified government program, and no contractual obligation was implicated. That's Mr. Trapp's own statement. What we have here, Your Honors, is a disconnect between the way the district court correctly found no infringement in its summary judgment decision and then completely treated the law differently a year later in its decision on attorney's fees. That's the basis for our assertion that there was an abuse of discretion by the district court. On the one hand, the district court correctly held that there was no basis in this record and that the MOU was insufficient, and indeed it was precisely, not close, not akin to, but precisely the type of situation that was addressed in Muni Auction. Yet, a year later, it denies attorney's fees, finding that there was no groundless infringement claim brought because Mr. Trapp had alleged the mere existence of the MOU, which is not the test. Again, the test under BMC and Muni Auction is more than just a contract. It has to be one in which the contracting party could be vicariously liable for the acts of the other party. And for reasons that we cannot explain, the district court simply changed its application of the law below, of this court, and that is the definition of misapplying the clear law, and that is the abuse of discretion here. We would submit, your honors, that contrary to what the district court stated, once BMC was decided, it was in fact a bright line rule, and that bright line is factual basis to claim that the accused infringer was or could be vicariously liable for the acts of the other. That is the law as we sit here today, and that was the law that the court misapplied. In denying the attorney's fees, the district court failed to even look at the contract in its attorney's fees decision, and the way it had certainly in the non-infringement decision to show and to describe why that MOU was nothing more than an aspirational expression of joint hope, and certainly not the type of arrangement that would make travel sentry vicariously liable. Your honors, because this case was groundless from the outset, based on the clear case law, and certainly by the time the BMC decision came down, that is the definition of a frivolous infringement claim under this court's case law, and the second part of the test is bad faith, and clearly under the case law, if a patentee knowingly asserts a groundless claim and pursues it and maintains it, bad faith can be inferred, and the court simply avoided making that finding because it started out by saying that there was no groundless claim in the first instance. Because it was knowingly brought, and knowingly brought without the basis, that in and of itself is the bad faith necessary to make this an exceptional case. I see that my time has expired. Thank you, your honors. Yes, thank you, Mr. Prickett. Mr. Dinan has a little rebuttal time. Yes, your honor. About three minutes. To go back to the issue of infringement, which also will go into the attorneys' fees argument, again, BMC did not set a bright line test, and indeed, I would submit, the BMC did not really fully describe what met the control and direction standard. Muni action then came out, which went, and among other items, addressed that issue, and again, the language of Muni action, the control and direction standard is satisfied when the law would traditionally hold vicarious liability. That helps define it, but again, by the pure meaning of those words, we would submit with respect that that case found that when you show vicarious liability, you would met the standard, but that that is not the only thing you can show, that it is not absolutely necessary to show that. Now, we know that question is pending in the en banc cases. We argue with respect that the test should be somewhere between the arm's length, which does not count, and the vicarious liability, and it's to this court to decide where that test would fall, but to argue here that BMC set a bright line is just simply not correct, and indeed, in the district court, Judge Italiano, in his ruling on attorneys' fees, made clear that, at least in his interpretation, that direction was not synonymous with vicarious liability, that this court had still left open that there could be some other standard, that vicarious liability was not the absolute thing that you have to prove. Two direction, and how this is distinguished from muni auction. They provide the keys. They provide the codes. They provide the training, the training manuals, how to decipher the codes. Without any of that, without all of that, you could not operate the system. This is direction, distinguished from muni auction, where they provided none of those things. It was just the way the program worked. You clearly have direction for which the TSA could not perform those steps, Again, we emphasize it was summary judgment. We do believe the vicarious liability. We do think there is vicarious liability, but those questions should have gone to the jury. Thank you. Thank you, Mr. Dian. We'll take the case under advisement.